**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARCUS MORGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 10 C 474** |
| **v.** | ) | |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| **SVT, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marcus Morgan ("Morgan") brought this action against defendant SVT, LLC, d/b/a Strack & Van Til Super Market, Inc., (collectively, "Strack") under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Compl.) [Dkt 1.] Morgan, who was formerly employed by Strack, alleges that he was terminated based on race (African-American), and seeks reinstatement to his former position, or in the alternative, an award of back pay and employment benefits. (Compl. at 6-7.) Federal question jurisdiction exists in this case under 29 U.S.C. § 1131. The parties consented to the jurisdiction of a magistrate judge [dkt 12], and the case was assigned to this court pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1 [dkt 14]. Before the court is Strack's Motion for Summary Judgment. [Dkt 32.] For the reasons stated below, Strack's motion is granted.

# BACKGROUND[1]

SVT, LLC is an Indiana limited liability company that operates a chain of grocery stores in Indiana and Illinois under the name of Strack. (Answer ¶ 3.) [Dkt 9.] On June 6, 2007, Strack hired Morgan to work as a part-time security officer at its Elston Avenue store in Chicago, Illinois. (Pl.'s LR Resp. ¶¶ 1, 4, 7-9.) Morgan had previously worked for ten years as a security officer at the same store when it was operated by Cub Foods, but had left his job there to work at a Home Depot home improvement center. (*Id.* ¶ 3; Def.'s App., Ex. C, Dep. of Marcus Morgan at 61.) When Morgan returned to the store to work for Strack, he did not leave his job at Home Depot. Instead, he worked a 40 hours per week at Home Depot and 20-30 hours per week at Strack. (*Id.* ¶ 4.) Those hours included days when Morgan did not work at Home Depot at all, as well as two-to six-hour shifts at Strack after he had already worked an eight-hour day at his other job. (*Id.*)

As a loss prevention officer, Morgan's job duties required him to minimize theft losses at the Elston Avenue store by preventing customers from shoplifting merchandise. He was hired by and managed by Ray Gutierrez, who is Hispanic. (*Id.* ¶¶ 6, 7.) Gutierrez acted as Strack's Loss Prevention Manager at four different locations. (*Id.* ¶ 20.) Gutierrez reported to John Mowrey, Strack's Director of Loss Prevention. (Def.'s LR Reply ¶ 3.)

Strack routinely monitors the incidences of shoplifting in its stores, in part, by keeping theft statistics on a store-by-store basis. Gutierrez sends emails to his manager or otherwise tracks the

---

[1] Unless otherwise noted, the following facts are taken from the parties' statements of fact filed pursuant to Local Rule 56.1, which are cited as: "SF ¶ __" [dkt 34], "Pl.'s LR Resp. ¶ __" [dkt 38], and "Def.'s LR Reply ¶ __" [dkt 45]. Statements not responded to or not controverted by specific references to the record are deemed admitted. N.D. Ill. LR 56.1(b)(3)(c). Strack has submitted exhibits supporting its motion in an Appendix, which are cited as: "Def.'s App. at Ex. __" [dkt 35, 46]. Morgan's exhibits have been submitted as part of his Local Rule 56.1 response.

weekly stops in the four stores he supervises.  (Def.'s App., Ex. D, Dep of Raymond Gutierrez at 9.)

The company maintains apprehension records that account for the number of "theft stops" its loss

prevention officers make each month of suspected shoplifters.  (Pl.'s LR Resp. ¶ 21; Def.'s App. at

Ex. D, Apprehension Records.)  A "theft stop" occurs after a customer takes an item, conceals it, and

walks past the last point of purchase.  Strack's officers are required to stop and detain the customer,

bring the customer in an enclosed area and identify what item was concealed and recovered.

(Gutierrez Dep. at 10.)  According to Gutierrez, Strack sends the customer on his or her way in most

cases, depending on the cost of the item.  (*Id.* at 9-11.)  In addition to theft stops, officers are also

required to make a "blisters empty package report" each Monday concerning merchandise that has

been removed from its packaging.  (*See* Pl.'s LR Resp. ¶ 21.)

The loss figures for Strack's Elston Avenue store were relatively high, both before and after

Morgan worked there.  (Pl.'s LR Resp. ¶ 23.)  The store lost between $100 and $300 each month to

shoplifting, placing it somewhere in the middle range of losses for the four stores Gutierrez

managed.  (*Id.*; Gutierrez Dep. at 16.)

Strack does not have a policy or quota requiring officers to make a specific number of theft

stops, but it maintains some expectations that its officers would keep their "numbers up."  (Pl.'s LR

Resp. ¶¶ 24, 27.)   According to Strack, the blister reports and apprehension records play a role in

Strack's decision whether to terminate the employment of a loss prevention officer, although Morgan

disputes that was the true motivation behind his termination.  (Pl.'s LR Resp. ¶ 22.)  Morgan knew

from his prior experience as a loss prevention officer that the number of stops he made would be an

important factor in his job evaluation, and Gutierrez stressed that point when Morgan was hired at

Strack.  (Pl.'s LR Resp. ¶ 9; Morgan Dep. at 96.)  In addition, Gutierrez advised Morgan that other

Strack officers had been terminated due to insufficient stop numbers. (Pl.'s LR Resp. ¶ 15.) Instead of written warnings for poor job performance, Gutierrez testified he would ordinarily give officers "a verbalization . . . to get their numbers up" whenever the stop numbers were too low. (Gutierrez Dep. at 9-10.)

At first, Morgan's stop numbers met Strack's expectations. (Pl.'s LR Resp. ¶ 24.) However, those numbers declined with each month of Morgan's employment at the Elston Avenue store. He made six stops in July 2007, five stops in August, and only one in September. (*See* Apprehension Records.) As a result, Gutierrez had between three and four conversations with Morgan in the months before his termination concerning what Gutierrez perceived to be Morgan's sub-par performance. (Pl.'s LR Resp. ¶ 25; Gutierrez Dep. at 19-21.) Morgan does not deny that those conversations took place, but characterizes them as "casual conversation" and disputes that they amounted to disciplinary warnings. (Pl.'s LR Resp. ¶ 25.) Although the Elston Avenue location was close to Morgan's home, Gutierrez and Morgan discussed the possibility of a transfer to a store Gutierrez managed in Forest Park, Illinois that had a higher crime rate. (Pl.'s LR Resp. ¶ 25.) Gutierrez testified that he suggested the change and Morgan decided it was too far for him to go, while Morgan testified that he suggested the move and Gutierrez did not respond. (*Id.*)

The dairy manager of the Elston Avenue store was a Caucasian man named Frank Kajdawowski. (Pl.'s LR Resp. ¶ 28.) On October 7, 2007, Morgan was speaking with Kajdawowski when the dairy manager removed a portion of a newspaper that was offered for sale, placed that portion (an article about the play "Jersey Boys") inside his rear pocket, and returned the remaining part of the paper back on the newsstand. (*Id.* ¶¶ 10, 11; Def.'s App., Ex. C, Written Statement of Morgan.) Morgan was hesitant to apprehend Kajdawowski due his management position. (Pl.'s LR

Resp. ¶ 16.) Instead of stopping him, Morgan went to the store's surveillance room and videotaped Kajdawowski walking through the store and eventually leaving it without paying for the paper. (*Id*. ¶¶ 12, 14; Morgan Dep. at 113-14.) Morgan reported the incident to the Elston Avenue store manager, Mike Gugliano, that night or the next day and he met with Gutierrez to review the videotape of Kajdawowski's behavior. (Pl.'s LR Resp. ¶¶ 13, 14.)[2] Morgan admits that during that meeting with Gutierrez to review the videotape, race was not part of the discussion. (Pl.'s LR Resp. ¶ 14.) They discussed the incident, and Morgan wrote a narrative description of what Kajdawowski had done. (*See* Written Statement of Morgan.) Kajdawowski was suspended for one day and placed on 60 days probation, with a notation that, following the probation, his position would be re-evaluated. (*Id*.; Def.'s LR Reply ¶ 11; Def.'s App., Ex. G, Employee Corrective Action Notice for Kajdawowski.)

Prior to reporting Kajdawowski, Morgan never received a written disciplinary notice for low or poor quality work, lack of production, or lack of theft stops, although he had the previously-described conversations with Gutierrez. (Def.'s LR Reply ¶ 4.) He had, however, received two Employee Corrective Action Notices on September 24, 2007 for being tardy on September 18 and 23, 2007, as his fourth and sixth "tardy," respectively. (Def.'s App., Ex. F.) Both were ultimately waived. (*Id*., Def.'s LR Reply ¶ 8.) On October 9, 2007, two days after the incident involving Kajdawowski, Gutierrez issued two Employee Corrective Action Notices concerning Morgan. One said that Morgan had shown "low quality of work" by having only one theft stop in September 2007, and none for the first week of October. (Pl.'s LR Resp., Ex. D.) In the notation section, Gutierrez

---

[2] Morgan states that he cannot recall whether he actually reported the incident on October 7 or October 8, 2007; Strack claims the report was made on October 8, 2007. (Pl.'s LR Resp. ¶ 13.) The parties' disagreement does not concern a material fact in this case.

stated that Strack expected Morgan to have two to three theft stops each week, and absent any improvement in his numbers, Morgan could be terminated. (Pl.'s LR Resp., Ex. D.) The second report noted that Morgan had arrived for work ninety minutes late on October 8, 2007, but had only notified Assistant Security Director Darrell Roberts of his lateness by email instead of alerting his immediate supervisor directly. (*Id.*, Ex. E.) Morgan testified that Strack had excused his occasional tardiness prior to that time, which Strack disputes. (Def.'s LR Reply ¶ 8.)

According to Gutierrez, after comparing Morgan's apprehension record with that of other loss prevention officers, Gutierrez decided to terminate Morgan's employment with Strack. (Gutierrez Dep. at 35-37.)[3] Gutierrez had the authority to terminate loss prevention officers after consulting with his own supervisor, John Mowery. (Pl.'s LR Resp. ¶¶ 30-33.) Morgan acknowledges that Mowery thought that Morgan's production "fell off totally in September." (Pl.'s LR Resp. ¶ 34.) Mowery agreed with Gutierrez, and Morgan was fired on October 24, 2007. (*Id.* ¶ 15.) Gutierrez issued an Employee Corrective Action Notice on that date stating that Morgan had been terminated for "poor quality of work," namely, "lack of production/theft stops." (Pl.'s LR Resp., Ex. G.) Morgan was replaced by someone who lasted one month due to lack of production. (Pl.'s LR Resp. ¶ 26.) The record does not disclose anything about that person. The second replacement, Jesus Gonzalez, remains employed at Strack. (*Id.*)

Although Gutierrez thought that Morgan should have stopped Kajdawowski at the exit doors, Mowery thought Morgan handled the incident correctly in bringing to management's attention. (Def.'s LR Reply ¶¶ 13, 14.) If Morgan had stopped Kajdawowski, it would have given him one

---

[3] Strack produced its Loss Prevention Report for 2009 and charts of "Apprehension by Officer" for 2007, 2008 and 2009. (Def.'s LR Stmt, Ex. D.)

more theft stop in October, but he would have needed more than that to prevent termination. (Def.'s LR Reply ¶ 17; Pl.'s LR Ex I, Dep. Jessica Hon at 13-14.)

Morgan admits that, other than his termination, he never felt that Gutierrez acted in a discriminatory manner toward him. (Pl.'s LR Resp. ¶ 17.) Up to that point, Morgan did not feel that Gutierrez or Gugliano, the store manager, had discriminated against him, and he had not observed racial discrimination by them. (*Id*. ¶17.)

On August 12, 2008, Morgan filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination and retaliation for reporting a white supervisor. (Compl., Ex. B.) The EEOC issued a right to sue letter on October 23, 2009 (*id.*, Ex. C), and Morgan brought this lawsuit on January 22, 2010. [Dkt 1.]

## LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, the evidence is viewed, and all inferences are drawn, in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Smith v. Ball State Univ.*, 295 F.3d 763, 767 (7th Cir. 2002). The mere existence of some factual dispute does not defeat a summary judgment motion; there must be a *genuine* issue of *material* fact for a motion to be denied. *Anderson*, 477 U.S. at 247-48. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. A factual dispute is "genuine" if the evidence is such that a reasonably jury could return a

verdict for the nonmoving party. *Id.* In determining whether summary judgment is warranted, courts do not make credibility determinations, weigh evidence, or decide what inferences to draw from the facts. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007) (citation omitted).

**B.    Title VII**

Title VII makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. §2000e-2(a)(1). A plaintiff can prove a Title VII claim when he proffers direct evidence that "is essentially an outright admission that a challenged action was undertaken for one of the forbidden reasons covered in Title VII." *Cordoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir. 2005) (internal quotation and citation omitted). When, as here, no direct evidence of discrimination has been presented, a claim of disparate treatment under Title VII may be shown indirectly under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this method, a plaintiff has the burden of establishing a prima facie case of discrimination by showing that he: (1) is a member of a protected class; (2) met the employer's legitimate business expectations; (3) suffered an adverse employment action; and that (4) similarly-situated employees outside of the protected class were treated more favorably. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). The failure to demonstrate any one of these requirements is fatal to a Title VII claim. *Atanus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008) ("Summary judgment is appropriate if the employee fails to establish any of the foregoing elements of the prima face case.").

If a plaintiff satisfies this standard, the burden shifts to the employer to proffer a legitimate,

non-discriminatory reason for the adverse employment action. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010). Once shown, the burden reverts to the plaintiff to demonstrate that the employer's proffered reason is pretextual and that a discriminatory animus was the true reason for the employer's action. *Id*. Under Title VII, "the ultimate burden of demonstrating that the defendant intentionally discriminated always remains with the plaintiff." *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004).[4]

## DISCUSSION

Morgan has not set forth any direct evidence of racial discrimination, nor does he argue that he can prove his case under that method. (*See* Pl.'s Opp'n.) [Dkt 39.] In fact, Morgan admits that, other than his termination, he never felt that Gutierrez discriminated against him or saw him discriminate against anyone else because of race. (Pl.'s LR Resp. ¶ 17.) Instead, both parties focus in their briefs on whether Morgan can make a case through the indirect method by using the *McDonnell Douglas* framework.

---

[4] Morgan also alleges that Strack violated his rights guaranteed by § 1981, which provides in relevant part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Although § 1981 requires the existence of an employment contract, at-will employees can invoke its protections against discriminatory employment practices. *See Walker v. Abbott Labs.*, 340 F.3d 471, 475-78 (7th Cir. 2003) (finding that § 1981 protects at-will employees from discrimination in pay or promotion). Although *Walker* addressed pay or promotion claims, courts have relied on it to find that § 1981 also protects an at-will employee from termination based on a discriminatory animus. *See, e.g.*, *Swearingen-El v. Cook Cnty. Sheriff's Dept.*, 416 F. Supp.2d 612, 617 (N.D. Ill. 2006). Courts "employ essentially the same analytical framework to employment discrimination cases whether they are brought under . . . Title VII [] or § 1981." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 n.4 (7th Cir. 2003). For this reason, Morgan's § 1981 claim is not discussed separately from his Title VII allegation; as the Title VII claim fails, his § 1981 claim is also unsuccessful for the same reasons discussed below.

Strack concedes that two of the prima facie elements for a Title VII case have been met: Morgan, an African-American, is a member of a protected class, and his termination constituted an adverse employment action. (Def.'s Mem. at 5, 7.) [Dkt 33.] Strack contends, however, that summary judgment is appropriate because Morgan cannot establish the other two necessary elements of his prima facie case: that a similarly-situated employee not in Morgan's protected class was treated more favorably than he, and that he met his Strack's legitimate job expectations.

Morgan does not fully develop an argument as to the elements required to make a prima facie case; rather, he jumps forward to argue that Strack's proffered reason for terminating him – his job performance – was illegitimate and merely a pretext for Strack's discriminatory intent. (Pl.'s Opp'n at 6-9.) In making that leap, however, Morgan fails to clarify exactly how he was treated differently because of his race.

## A.    Morgan's contention of disparate treatment

It is difficult to ascertain the precise nature of Morgan's allegation of race discrimination. Morgan believes that his termination was "'race based' because he called out a Manager and Frank [Kajdawowski] was Caucasian." (Pl.'s LR Resp. ¶ 19.) However, he does not explain how the termination was "race based" other than stating that he is black and Kajdawowski is white. Is Morgan claiming that an employee in his position outside his protected class would not have been fired if he had "called out" a manager? Or is his claim that, if the manager he reported had not been white, then Morgan would not have been fired? Morgan's submissions do not provide a clear answer, and nothing in the record before the court supports either supposition. Morgan has not presented any evidence to show that a non-African-American security officer would have been

treated differently in a similar situation, or that he would have been treated differently if he had "called out" an African-American manager.

In fact, the record is to the contrary. Mowery testified that he believes Morgan handled the incident properly, while Gutierrez testified that he thinks Morgan should have gone further and stopped Kajdawowski before he left the store. The statement by Strack's Director of Human Resources Jessica Hon to the EEOC that "had [Morgan] apprehended the supervision [Kadjawowski] he would have prevented his termination for lack of theft stops" (Def's LR Reply ¶ 16), which Morgan cites in his brief (Pl.'s Opp'n at 11), hurts rather than helps Morgan. No one at Strack criticized Morgan for "calling out" Kadjawowski. The only difference in their views is whether Morgan went far enough.

Notably, Morgan does not present any evidence of how Strack treated any other security officers. He does not, for example, present any evidence – or even any argument – that a non-African-American security officer with his performance record would not have been fired. Morgan's only argument of disparate treatment on the basis of race is a few brief references in his response that Strack fired Morgan, an African-American, but only suspended Kajdawowski. (Pl.'s Opp'n at 8.) Morgan does not develop his argument further, but the court will look at the record to see if the evidence would allow a comparison with Kajdawowski to establish the "similarly situated" element of Morgan's prima facie case.

## B.     Similarly-situated employee

To establish this prong of his prima facie case, Morgan must show that the comparable employee is outside his protected class, is similarly situated to him, and was treated more favorably.

*Keeton*, 667 F.3d at 884. Kajdawowski is white and he was suspended from his employment without pay for one day and put on probation for 60 days after the events of October 7, 2007. The remaining question is whether Kajdawowski was similarly situated to Morgan, which involves a "flexible, common-sense" investigation of the factors relevant to deciding if Strack acted with a discriminatory animus. *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007).

Employees need not be identical in all ways in order to be similarly situated. *Caskey v. Colgate-Palmolive Co*., 535 F.3d 585, 592 (7th Cir. 2008). A plaintiff meets his burden under the *McDonnell Douglas* standard by showing that the proposed co-worker: (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in substantially similar conduct such that the employer would not have grounds for treating the plaintiff and the comparator differently. *Coleman v. Donahoe*, 667 F.3d. 835, 847 (7th Cir. 2012). The inquiry does not involve a "magic formula" or a "one-to-one mapping" between employees. *Humphries v. CBOCS West, Inc*., 474 F.3d 387, 405 (7th Cir. 2007). Instead, courts examine the evidence in "light of common experience" in order to determine if unlawful discrimination is at play in the employer's personnel decision. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978).

In order to establish the first element of that standard, Morgan must show that he and Kajdawowski dealt with a common supervisor who acted as the decision-maker for the adverse action handed out to both employees. *See Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011) (stating that a decision-maker in this context means the person responsible for the employment decisions at issue). Morgan worked directly for Gutierrez, who hired him and had the authority with Mowrey's knowledge to fire loss prevention officers like Morgan. But Morgan has not shown, or even alleged, that Gutierrez supervised Kajdawowski or was involved in

any way in deciding the discipline imposed on Kajdawowski, who was not a security officer like Morgan. Morgan does not identify who decided on Kajdawowski's discipline. Gutierrez testified that Kajdawowski was suspended "by the management," but he did not clarify to whom he referred. (Gutierrez Dep. at 32.) The Elston Avenue store manager was Mike Gugliano, but Morgan has not alleged that Gugliano was responsible for his (Morgan's) termination. Gutierrez testified that he consulted his own supervisor, John Mowery, before terminating Morgan. Thus, Morgan has not shown that the same supervisor was responsible for terminating him and suspending Kajdawowski.

Morgan fares no better under the second element of the comparator standard. To make the difference between Morgan's termination and Kajdawowski's discipline a meaningful indicia of discrimination, Morgan must demonstrate that he and Kajdawowski were subjected to the same standards of conduct as part of Strack's personnel decisions. Ordinarily, this inquiry is more focused on whether the employer subjected its employees to different employment policies than with the employees' respective job titles. *Coleman*, 667 F.3d. at 848. Titles and positions, however, can be significant when one employee is lower ranking than another, and the employer applies different standards to workers in separate employment categories. When that is the case, and when job performance is at issue, an employer may legitimately hold different employees to separate standards of conduct. *See Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1124 (7th Cir. 1998). Again, to make the comparison meaningful, Morgan would have to show that Strack applied a comparable standard of conduct to part-time security officers like him as it did to managers like Kajdawowski. *See Coleman*, 667 F.3d at 849 (noting that where the issue is the quality of a plaintiff's work, the difference in employees' positions "will often by itself account for the less favorable treatment of the plaintiff").

- 13 -

Kajdawowski was disciplined for intentional disregard of rules and regulations, failure to follow instructions and behavior detrimental to morale. (Def.'s App., Ex. G, Employee Corrective Action Notice for Kajdawowski.) Morgan, on the other hand, was terminated for performance problems. He would have to show that Strack applied the same standard to a manager's rule infraction as it did to a non-manager's poor job performance. *See Coleman*, 667 F.3d at 849 (stating that "[i]n cases involving the quality of job performance, for example, a would-be comparator's professional role may be so different from the plaintiff's as to render the comparison effectively useless" (internal quotation omitted.)).

Additionally, Morgan must also account for possible work history differences between himself and Kajdawowski that could explain the different employment actions Strack took. To do so, a plaintiff can show that he and the comparator "had a comparable set of failings." *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 530 (7th Cir. 2003). "[T]he comparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories." *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009). Morgan received several verbal notices and one written warning that he was not performing adequately before he was terminated on October 24, 2007. Morgan has not presented any evidence suggesting that Kajdawowski had an equivalent history of warnings or that he had ever engaged in any prior misconduct. In the absence of evidence related to Kajdawowski's work history or the reason for his suspension, Morgan has not shown that the difference in their treatment cannot be explained by variables other than race.

The third comparator element requires Morgan to demonstrate that he and Kajdawowski engaged in conduct of comparable seriousness. This element is satisfied when the plaintiff and the

comparator have engaged in comparable policy violations but received different levels of discipline. *Coleman*, 667 F.3d at 850. The rules of conduct that have been violated do not need to be identical in all respects, and plaintiffs can prevail by focusing "more on the nature of the misconduct rather than on specific company rules." *Hiatt v. Rockwell Intl. Corp.*, 26 F.3d 761, 770 (7th Cir. 1994).

Morgan's and Kajdawowski's actions differed significantly from one another. Strack contends that Morgan's performance involved an ongoing failure to make sufficient theft stops that preceded the October 7, 2007 incident by several months and continued for two weeks after the incident. (*See* Def.'s Mem. at 6-7.) Preventing shoplifting losses was an important part of Strack's business plan. The Elston Avenue store lost between $100 and $300 each month from shoplifting. In order to mitigate its losses, Strack hired security guards, supervised them with theft loss managers, and maintained stop records and loss records for each store. (SF ¶¶ 21-23.) By contrast, Kajdawowski's suspension resulted from a single failure to pay for the merchandise he took (which was one part of a newspaper).

The purpose of the "similarly-situated co-worker" element is to "isolate the critical independent variable – discriminatory animus." *Coleman*, 667 F.3d at 846 (internal quotation and citation omitted). "[T]he proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision." *Id.* at 841. Here, Morgan's and Kajdawowski's positions were significantly different, the bases for the employment action were very different, and the decision-makers were not the same. A reasonable juror could not draw an inference from these circumstances that the difference in the employment action taken was the result of racial animus. Accordingly, Morgan has not shown that Kajdawowski or any other Strack employee who was not African-American and who was similarly

situated to him was treated differently.

## C.     Strack's job expectations

Another requirement of the prima facie case is proof that the employee was meeting the employer's legitimate job expectations. To determine whether an employee met the employer's legitimate job expectations, a court looks at the plaintiff's job performance "through the eyes of his supervisors at the time of his termination." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 310 (7th Cir. 2012) (internal quotation omitted). The court will not "second-guess an employer's policies that are facially legitimate." *Brummett v. Lee Enters, Inc.*, 284 F.3d 742, 745 (7th Cir. 2002).

Here, Strack had an expectation that Morgan would keep the number of his theft stops "up." Instead of demonstrating that he met Strack's expectations, however, Morgan argues that Strack's stated reason for terminating him – lack of performance – was not legitimate but rather pretextual. In some circumstances, a plaintiff who cannot demonstrate that he met the expectations may demonstrate that the employer applied its job expectations to employees in a discriminatory manner. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). Allegations to that effect must be supported by "actual evidence" that the employer's job expectations varied by race. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 394 (7th Cir. 2010). The evidence must be substantial enough "to raise an inference that an employer applied its legitimate employment expectations in a disparate manner[.]" *Peele*, 288 F.3d at 329. When the plaintiff does so, "the second and fourth prongs [of the prima facie case] merge – allowing plaintiffs to stave off summary judgment for the time being, and proceed to the pretext inquiry." *Montgomery*, 626 F.3d at 394.

Morgan has not introduced *any* evidence that Strack's job expectations varied by race, nor

has he produced any evidence that Strack disparately applied its expectations to employees of different races. Other than the passing reference to Kadjawowski discussed above, Morgan has not presented evidence regarding any Strack employee except himself. He has not shown that he can establish the elements of the prima facie case of discrimination.

### D.    Absence of Prima Facie Case

Morgan appears to assume that he can satisfy the *McDonnell Douglas* framework by carrying his burden at the pretext stage without first demonstrating all the elements of a prima facie case of discrimination. The burden-shifting sequence of the *McDonnell Douglas* framework, however, requires that the plaintiff establish the elements of the prima facie case before the employer is even required to articulate a legitimate, nondiscriminatory reason for its action. That is because "[o]nce a prima facie case is established, a presumption of discrimination is triggered." *Coleman*, 667 F.3d at 845. Without that presumption, however, there is nothing for the defendant to rebut.

Without some evidence of racially disparate treatment, Morgan's pretext argument is not enough to establish a claim of discrimination. A plaintiff cannot "put[] the pretext cart before the prima facie horse." *Brummett,* 284 F.3d at 744. If a plaintiff has established the other elements of a prima facie case, he may, in some circumstances, defeat a motion for summary judgment if he presents sufficient evidence that the employer's job expectations themselves were pretextual. *Id.* at 745. If a plaintiff shows that he has "performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same – whether the employer is lying." *Hague v. Thompson Distrib. Co.,* 436 F.3d 816, 823 (7th Cir. 2006). But to invoke that exception, the plaintiff must first

demonstrate all of the other elements of his prima facie case.  *See Brummett*, 284 F.3d at 745**.**

The *Brummett* case is analogous to the situation presented here.  There, the plaintiff, a truck driver, was fired for failing to maintain a valid driver's license and a favorable driving record.  The court's words there apply here:

> We have undertaken a careful review of the record below, and there is simply no evidence that Brummett's race had anything to do with his termination.  It is not enough that he is African American, was disliked, and was fired; he must present some evidence, direct or indirect, that he was fired because of his race.  For example, his theory that he was fired because of his confrontation with a third party – even if true – has nothing to do with his race.

*Brummett*, 284 F.3d at 745 n.1.

### E.     Retaliation

Morgan's response to the motion attempts to demonstrate a case of discriminatory treatment by blending in argument and case law relating to claims of retaliation.  (*See* Pl.'s Opp'n at 7-8 (citing *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009); *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997)).)  His argument is  premised on the timing of his termination (not long after he reported Kadjawowski) and what he characterizes as Strack's pretextual basis for terminating him.  A plaintiff who asserts a claim of retaliation under Title VII may survive summary judgment by showing suspicious timing and a pretextual excuse for the employment action.  *See, e.g., Coleman*, 667 F.3d at 860.

There are several problems with Morgan's approach. First, it does not appear that he is asserting a claim of  retaliation.   Although his complaint to the EEOC included a claim that he was retaliated against for reporting a white supervisor, there is no claim for retaliation alleged in his

complaint in this lawsuit.

Second, Morgan fails to identify any facts that would support a claim for retaliation under Title VII. That statute forbids retaliation against a person who "has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). Title VII only provides a cause of action if the retaliation was for an activity that was itself protected by Title VII. *See, e.g., Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003). Morgan does not allege that he was fired in retaliation for opposing race discrimination at his workplace, or any other activity protected by Title VII. It does not appear from the record that Morgan ever complained about discrimination before his termination, or that he ever felt he had anything to complain about other than his termination. Reporting an employee for shoplifting – even an employee of another race – is not itself an activity protected by Title VII, and the mere fact that Morgan's termination followed several weeks after that reporting does not by itself create an inference that Strack violated Title VII.

## F.     Morgan's pretext argument

In the absence of any evidence of disparate treatment on the basis of race or any evidence of retaliation for engaging in activity protected by Title VII, it is not necessary to reach Morgan's pretext argument. But because it is the centerpiece of his response to the motion, this opinion will address the remaining steps in the *McDonnell Douglas* framework.

Here, Strack claims that it had a legitimate, non-discriminatory reason for terminating Morgan because he failed to make a sufficient number of theft stops even after he had been warned that his performance did not meet the company's expectations. The record shows that Strack

believed that Morgan's job performance was inadequate, both before and after the incident with Kadjawowski. As noted earlier, Gutierrez's written notice occurred after a series of verbal warnings he gave Morgan concerning his low theft stops. (Pl.'s LR Resp. ¶ 25.) Although Morgan did not receive a written notice of poor performance before he reported Kajdawowski's activity on October 8, 2007, Gutierrez told Morgan on several occasions before the incident that his stop numbers were too low. (*Id*.) Morgan disagrees that these verbal notices constituted disciplinary actions, but he concedes that they were "warnings." (*Id*.) Gutierrez's verbal warnings are evidence that, prior to the incident with Kadjawowski, Morgan's supervisor did not believe that his performance was meeting Strack's expectations for a loss prevention officer.

The reason for the warnings is evidenced by the records Gutierrez kept of Morgan's stop numbers: six in his first month of employment, five in the second month, and only one in the third. (*See* Apprehension Reports.) Significantly, Morgan does not contest the accuracy of those records. Those reports support Mowery's testimony that he thought Morgan's production fell off totally in September. Moreover, the record shows that Morgan did not make *any* stops between the October 9, 2007 writeup and his termination on October 24, 2007, despite being warned in the writeup that he would be fired if his numbers did not improve. (Apprehension Reports; Pl.'s LR Resp., Ex. E and G.)

In the last two months of his employment with Strack, Morgan stopped only one shoplifter, and reported Kadjawowski. Even when viewed in the light most favorable to Morgan, it is difficult to understand how Strack's decision to terminate Morgan based on poor job performance can be construed as a pretext for a discriminatory intent under these facts. Such a conclusion is even harder to make in light of Morgan's admission that he never observed any sign of racial discrimination by

Gutierrez in the years he had known him at Strack and at Cub Foods. (Morgan Dep. at 142.) This includes the absence of any prior discriminatory behavior towards Morgan himself. (Pl.'s LR Resp. ¶ 17.) A plaintiff's failure to identify such personal knowledge can weaken his ability to show pretext. *See Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009).

Once the employer has established a non-discriminatory reason for its adverse employment action, the burden shifts back to the plaintiff to show that reason was merely a pretext for discrimination. *Everroad*, 604 F.3d at 477. This involves more than showing that the employer was mistaken or that its proffered reason is without merit. *McCoy v. WGN Contl. Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). That is to say, the only relevant issue is whether Strack actually thought that Morgan's performance was inadequate or whether its "proffered reason is a lie or completely lacks a factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000); *see also Hudson*, 375 F.3d at 561 ("Pretext is more than a mistake on the part of the employer; it is a phony excuse.").

As discussed above, Morgan has presented no evidence that the job performance expectations applied to him differed from those applied to any other security officer who was not in his protected class. Rather, he argues that the expectation was "illegal" and therefore "illegitimate," and that Strack gave shifting explanations for his termination, which, he claims, is evidence that the reason was pretextual. (Pl.'s Opp'n at 5, 9.)

Specifically, Morgan argues that by terminating him for low performance, that is, not enough theft stops, Strack was "asking him to do something illegal" because such stops would constitute

false imprisonment and kidnaping unless they fell within the confines of the "Illinois Shopkeeper's Privilege." (Pl.'s Opp'n at 5-6.) The law Morgan cites, in effect at the time he was terminated, required that a merchant have "reasonable grounds to believe that a person has committed retail theft" in order to detain them. 720 Ill. Comp. Stat. 5/16A-5 (2007).[5] Morgan contends that because Strack did not set forth any evidence to show Morgan had "reasonable grounds" to make theft stops but failed to do so, its expectations were not legitimate. (Pl.'s Opp'n at 6.)

Morgan's argument is a red herring and lacks any basis in the record. He does not cite evidence suggesting that Strack encouraged or expected him to make unreasonable, let alone "illegal," theft stops. He acknowledges that he was not required to make a specific quota of stops, just to keep his numbers up. In light of the undisputed evidence that the store where Morgan was a security officer had substantial losses from shoplifting throughout the relevant time, Morgan fails to explain why Strack's expectations could only be met by detaining persons without reasonable grounds. Morgan does not claim, for example, that other loss prevention officers who had higher stop numbers met Strack's expectations by engaging in activities that violated the statute. Nor does he claim that the six stops he made in his first month of employment were the result of actions that violated the statute.

Finally, Morgan attacks the credibility of Strack's proffered reason based on alleged conflicts in the company's various statements concerning his termination. (*Id*. at 3-4.) Strack's EEOC position statement signed by Strack's Director of Human Resources Jessica Hon stated that Morgan would not have been fired had he stopped Kajdawowski from leaving the store with the paper,

---

[5] The statute was repealed effective January 1, 2012, by P.A. 97-597, and replaced with 720 Ill. Comp. Stat. 5/16-26 (2012).

because it would have given him one theft stop in October. (Compl., Ex. A.) In her deposition, however, Hon stated that Morgan would have been fired even if he had stopped Kajdawowski. (Pl.'s LR Resp., Ex. I at 14, Deposition of Jessica Hon.) Hon explained that she changed her position on this issue based on the deposition testimony of Gutierrez and Mowery. She had initially believed that Morgan only needed one theft stop in October 2007 to save his job, but she realized from the deposition testimony that "many more" were required. (*Id.*)

Hon's testimony does not demonstrate that Strack's reason for terminating him was a pretext for discrimination. The salient issue is not whether Morgan would have kept his job if he had made one, two, or "many more" stops in October 2007, but the honesty of the reason he was fired, which is that he did not make any stops that month, even after he was warned in the written notice that he would be terminated if his theft stop numbers did not improve. Morgan has not shown that Strack's proffered reason for terminating his employment is a pretext for discriminating against him on the basis of race.

Morgan argues that the court must disregard the testimony of defendant's witnesses because they have been personally accused of violating federal law and thus have a "reputational interest" in the case. (Pl.'s Opp'n at 11.) Contrary to Morgan's claim, however, the court is not required to disregard the testimony of Strack's witnesses simply because Morgan has accused them of racial discrimination. Morgan cites *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133 (2000), but that case does not support his argument. The Court there stated that on a Rule 50 motion, like a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence. *Id.* at 150. That is well established. But it is equally well established that a nonmovant must demonstrate that

there is a genuine issue for trial by coming forward with evidence on the essential elements of his case on which the nonmovant must bear the burden at trial. *Celotex*, 477 U.S. at 322.

As the Seventh Circuit has stated:

> [E]valuations of witness credibility are inappropriate at the summary judgment stage. However, when challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts – no proof – to support his claims, summary judgment in favor of the defendant is proper.
>
> *     *     *     *     *
>
> [S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. Here, all the plaintiffs have to go on is a collective hunch about the defendant's motives, which in itself will not survive a motion for summary judgment.

*Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (quotations and citations omitted; emphasis in original).

Morgan has not shown that there is a genuine dispute about a material fact here. All he has is his unsupported hunch that some discriminatory motive was behind his termination. That is not enough to survive a motion for summary judgment.

## CONCLUSION

For the foregoing reasons, Strack's Motion for Summary Judgment is granted. Judgment is entered for the defendant and against the plaintiff.

**IT IS SO ORDERED**.

_____
**Geraldine Soat Brown**
**United States Magistrate Judge**

**Dated: September 13, 2012**

- 24 -